UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FOR PUBLICATION

GURMEET SINGH DHINSA,

                          Petitioner,

            – against –

J.E. KRUEGER,

                          Respondent.

**MEMORANDUM & ORDER**

12-cv-4176 (ERK)

KORMAN, *J*.:

Petitioner, Gurmeet Singh Dhinsa, was convicted of numerous offenses following a jury trial that involved approximately 100 witnesses and lasted nearly four months. *United States v. Dhinsa*, 243 F.3d 635, 642 (2d Cir.), *cert. denied*, 534 U.S. 897 (2001). The evidence presented at trial, as described by the Second Circuit on direct appeal, showed that "Dhinsa was the self-professed leader of the 'Singh Enterprise,' a vast racketeering organization built around a chain of fifty-one gasoline stations that Dhinsa owned and operated throughout the New York City metropolitan area under the name 'Citygas.'" *Id.* at 643. Dhinsa's enterprise "generated tens of millions of dollars, which were used, *inter alia*, to bribe public officials, purchase weapons and carry out crimes of violence aimed at protecting the enterprise's operations and its profits." *Id.* The jury found Dhinsa guilty on 21 of 29 counts charged in the superseding indictment, including four counts for which the jury could have imposed the death penalty, although it chose not to do so. *See id.* at 642.

Dhinsa was sentenced to eight life terms for two counts of racketeering, two counts of murder in aid of racketeering, two counts of obstruction of justice murder, one count of conspiracy to commit kidnapping in aid of racketeering, and one count of kidnapping in aid of racketeering.

Judgment at 1, *United States v. Dhinsa*, No. 97-cr-672-ERK (E.D.N.Y. Oct. 15, 1999), ECF No. 440. Several other terms of imprisonment were imposed for various firearm, conspiracy, and fraud offenses, including four 120-month terms to run consecutive with each other but concurrent with the life terms; eight 60-month terms to run consecutive with each other but concurrent with the life terms; and one 60-month term to run consecutive with all other terms. *Id.* The Second Circuit ultimately vacated two of the counts for which Dhinsa had been sentenced to life terms and one of the counts for which he had been sentenced to a 60-month term to run concurrent with the life terms. *See Dhinsa*, 243 F.3d at 677–78. This left Dhinsa with his current sentence: six life terms, four 120-month terms, and eight 60-month terms. Two of the six life terms rest on obstruction of justice murder charges, 18 U.S.C. § 1512(a)(1)(C) (counts 5 and 9). Dhinsa filed the instant petition for a writ of habeas corpus challenging these two counts.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. *Obstruction of Justice Murders*

The two obstruction of justice murder convictions at issue here are predicated on the murders of Manmohan Singh and Satinderjit Singh, two Citygas employees. *Dhinsa*, 243 F.3d at 660. The evidence presented at trial regarding these murders is detailed in the Second Circuit decision on direct appeal. Numerous witnesses testified that throughout 1997, Manmohan[1] was actively searching for his brother, Kulwant, who had disappeared from a Citygas station in 1995. *Id.* at 643, 660. Manmohan suspected Dhinsa of kidnapping Kulwant or otherwise contributing to Kulwant's disappearance. *See id.* at 660. According to trial testimony from Marvin Dodson and Evans Alonzo Powell (two of Dhinsa's co-conspirators), Dhinsa "instructed Dodson to kill

---

[1] "The majority of the people involved in this case share the same religious affiliation, which requires the men to adopt the last name 'Singh.' To avoid confusion, we will refer to [the petitioner] as Dhinsa and other persons by their first name." *United States v. Dhinsa*, 243 F.3d 635, 642 (2d Cir. 2001).

Manmohan because [Manmohan] was cooperating with the police in a murder investigation involving [Dhinsa's] brother." *Id.* Specifically, "Dhinsa told Dodson to check with Gulzar [another member of Dhinsa's criminal enterprise] to confirm [Manmohan's] identity and directed Dodson to go to a nearby Citygas station to pick up the gun to be used for the murder [of Manmohan]." *Id.* at 660–61. Next, "at Dhinsa's suggestion that he find someone to assist him in committing the murder, Dodson contacted Powell, a member of the trio of hitmen employed by Dhinsa." *Id.* at 661. The Second Circuit described the evidence against Dhinsa as "direct and overwhelming," *id.* at 660, on this issue of Manmohan's obstruction of justice murder:

> Powell's testimony and cellular telephone and pager records corroborate Dodson's version of the events surrounding Manmohan's murder. The telephone records establish that Dodson made numerous attempts to contact Dhinsa and Gulzar during the period March 14 through March 16, 1997, the day Manmohan was murdered. These records also indicate that Dodson called Dhinsa and Gulzar within hours after Manmohan was murdered, presumably to inform them of his success. The government also presented evidence that the vehicle driven by Dodson during the murder was registered to a company owned by Dhinsa, and that Dhinsa arranged to have the truck repainted and re-registered following Manmohan's murder.

*Id.* at 661.

The evidence supporting Satinderjit's obstruction of justice murder was equally overwhelming:

> Numerous witnesses testified that Satinderjit was actively cooperating with police in an investigation of Dhinsa and the Singh Enterprise at the time he was murdered. Uberoi, Satinderjit's girlfriend, testified that Dhinsa contacted her twice, threatening to have her and Satinderjit shot if Satinderjit continued to assist the police in its investigation of Dhinsa. Dodson testified that Dhinsa ordered Satinderjit murdered shortly after [a] July 1997 police raid of his Citygas offices in Brooklyn, New York. Dodson further testified that Dhinsa drove him to Satinderjit's neighborhood and identified his apartment. A short time later, Dhinsa provided

> Dodson with a photograph of Satinderjit and a printout of the registration and license plate for Satinderjit's car. . . .
>
> Similar to Manmohan's murder, cellular telephone records corroborate Dodson's version of Satinderjit's murder. These records show that Dhinsa made in excess of thirty telephone calls to Dodson in the days and weeks before Satinderjit was murdered and establish a sequence of calls between Dhinsa, Samuels [another of Dhinsa's hitmen] and Powell on June 18, 1997, the day Satinderjit was murdered. The telephone records confirm Dhinsa's presence in calling areas near the location where Satinderjit was murdered. The government also presented testimony from Samuels and Powell, who corroborated Dodson's version of Satinderjit's murder, and from Santokh, an employee at a Citygas station owned by Dhinsa, who testified that Dhinsa directed him to change the license plate on the van used by Dodson during Satinderjit's murder.

*Id.* The Second Circuit continued: "With respect to Satinderjit, the evidence presented at trial established that Satinderjit was in fact cooperating with the [local] police at the time Dhinsa ordered Dodson to kill him, providing police with information regarding Manmohan's murder, Kulwant's disappearance and the Citygas pump-rigging scheme." *Id.* at 657. The evidence at trial demonstrated that federal officers began an extensive investigation of Dhinsa in July 1997, just one month following Satinderjit's June 1997 murder and four months following Manmohan's March 1997 murder. *Id.* at 644–45, 647. Indeed, as relevant to this petition, the Second Circuit specifically held that "[t]he record amply demonstrates that Dhinsa murdered Manmohan and Satinderjit to 'depriv[e] the government of . . . potential witness[es].'" *Id.* at 657 (citations omitted).

## II. *Post-Conviction History*

On September 16, 2002, Dhinsa filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 in the Central District of California, where he was incarcerated, in which he argued that he had received the ineffective assistance of trial counsel (and not that he was actually innocent). Resp't's Mem. Opp'n Habeas Pet., Gov't App'x at 66, 69, ECF No. 25. The petition

was dismissed on the ground that a petition for a writ of habeas corpus challenging the validity of a judgment of conviction had to be filed in the judicial district in which he was convicted. *See id.* at 74. Dhinsa then filed a motion to vacate sentence pursuant to 28 U.S.C. § 2255 in the Eastern District of New York. *Id.* at 51. Dhinsa had filed his petition in California at the eleventh hour, and the statute of limitations was not tolled during that proceeding in California. *See Dhinsa v. Herrera*, 173 F. App'x 630, 630–31 (9th Cir. 2006). By the time Dhinsa filed his motion pursuant to § 2255, it was untimely and thus dismissed. *Id.* at 630. The Second Circuit denied a motion for a certificate of appealability and dismissed Dhinsa's ensuing appeal, Resp't's Mem. Opp'n Habeas Pet., Gov't App'x at 107, ECF No. 25, and the Supreme Court denied certiorari. *Dhinsa v. Herrera*, 543 U.S. 1188 (2005).

On June 29, 2004, Dhinsa filed a motion under Fed. R. Civ. P. 60(b)(6) in the Central District of California, arguing that his original § 2241 petition should have been transferred to the Eastern District of New York rather than dismissed. Motion for Relief from Judgment, *Dhinsa v. Herrera*, No. 02-cv-7211-VAP-SGL (C.D. Cal. June 29, 2004), ECF No. 6; *Dhinsa*, 173 F. App'x at 631. This motion was rejected, as was the appeal that followed. *Dhinsa*, 173 F. App'x at 631. On May 16, 2012, Dhinsa filed another petition pursuant to § 2241, this time in the Middle District of Pennsylvania. *Dhinsa v. Hufford*, No. 3:12-CV-912, 2012 WL 3579652, at *1 (M.D. Pa. Aug. 17, 2012). The petition was based on *Fowler v. United States*, 563 U.S. 668 (2011), which interpreted the federal jurisdictional element of the federal witness tampering statute, 18 U.S.C. § 1512(a)(1)(C). Although the evidence that Dhinsa was responsible for the death of two young Indian immigrants was overwhelming, he argued that he is "actually innocent" because the federal jurisdictional hook in 18 U.S.C. § 1512(a)(1)(C) has taken on new gloss under *Fowler*. Habeas Pet. at ¶ 10, ECF No. 1. Specifically, he argued that the prosecution was required to show that

there was a "reasonable likelihood" that a relevant communication "would have been made to a federal officer" by Dhinsa's murder victims. *Id.*; *see* Pet'r's Mem. Supp. Habeas Pet. at 10–12, ECF. No. 2. Because the jury was not charged in accordance with *Fowler*, and the evidence at trial was insufficient to meet this standard, Dhinsa claimed that he was entitled to have the part of the judgment that convicted him of obstruction of justice murder (counts 5 and 9) set aside. Habeas Pet. at ¶ 10, ECF No. 1; *see* Pet'r's Suppl. Mem. Supp. Collateral Relief at 8, 12, ECF No. 24.

Dhinsa's petition was transferred to the Eastern District of New York, Order, Aug. 17, 2012, ECF No. 11, and then to the Second Circuit pursuant to 28 U.S.C. § 2255(h) for certification as a successive petition. Order at 2, Aug. 23, 2012, ECF No. 14. On May 6, 2013, the Second Circuit remanded the petition to determine whether (1) Dhinsa "satisfies the criteria set forth in 28 U.S.C. § 2255(e), and may therefore bring his petition under . . . 28 U.S.C. § 2241, *see Triestman v. United States*, 124 F.3d 361 (2d Cir. 1997); *see also Fowler v. United States*, 563 U.S. 668 (2011) (requiring, for a conviction under 18 U.S.C. § 1512(a)(1)(C), the government to show a 'reasonable likelihood' that the victim would have communicated with federal officials); and, if so, (2) whether the petition can and should be granted under § 2241." Mandate, May 6, 2013, at 1–2, ECF No. 15.

## DISCUSSION

Title 28 U.S.C. § 2255 provides that "[a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence." Dhinsa, who previously filed a motion pursuant to § 2255, is precluded from filing a petition challenging his conviction because he cannot satisfy the criteria for filing a successive and otherwise untimely petition as set out in 28 U.S.C. § 2255(f), (h). Nevertheless, § 2255(e) provides that § 2255 will not bar a petition for

a writ of habeas corpus pursuant to § 2241, so long as "it also appears that the remedy by motion [pursuant to § 2255] is inadequate or ineffective to test the legality of his detention." Under circumstances that I will discuss more fully, the Second Circuit has held that § 2255(e) may permit a prisoner to file a petition challenging the legality of his detention. *Triestman v. United States*, 124 F.3d 361, 377 (2d Cir. 1997). While Dhinsa has done so here, the petition fails because even if he is actually innocent of the obstruction of justice murders, Dhinsa is lawfully detained pursuant to his four unchallenged life sentences.

Indeed, to the extent that a federal habeas petitioner challenges a conviction for which he received a concurrent sentence, he is not challenging the validity of his detention. Instead, his standing to bring such a challenge is predicated on the assumption that he will suffer collateral consequences that have nothing to do with the validity of his detention. *See United States v. Vargas*, 615 F.2d 952, 959–60 (2d Cir. 1980). Such challenges most frequently involve consequences that are likely to occur only if the petitioner is prosecuted for a separate crime committed after he is released from custody. *See id.* Denying a petitioner the opportunity to assert such a challenge does not raise the kind of concerns which animated the holding in *Triestman*, namely, cruel and unusual punishment in violation of the Eighth Amendment or "the continued imprisonment of an actually innocent person" in violation of the due process clause. 124 F.3d at 379. There is thus no reason to stretch the language of § 2255(e) to create an "escape hatch" where, as here, a successful challenge to two of six life sentences would not implicate any of *Triestman's* concerns. Indeed, this analysis is also consistent with the concurrent-sentence doctrine, to which I now turn, before discussing the underlying merits of Dhinsa's argument that *Fowler v. United States*, 563 U.S. 668 (2011) would otherwise entitle him to relief here.

## I.       The Concurrent-Sentence Doctrine

While it has taken slightly different forms throughout history, the concurrent-sentence doctrine is understood today as a principle of law under which an appellate court reviewing a conviction need not hear the challenge if another valid conviction carries a sentence equal to or greater than the challenged conviction. *Concurrent-Sentence Doctrine*, BLACK'S LAW DICTIONARY (10th ed. 2014). The doctrine traces back to at least 1711 and was expressly utilized throughout the Eighteenth Century by English appellate courts hearing criminal cases. *See* Nathan H. Jack, *Toward a Uniform Rule: The Collapse of the Civil-Criminal Divide in Appellate Review of Multitheory General Verdicts*, 81 U. CHI. L. REV. 757, 760 & n.16 (2014). The Supreme Court employed an early variation of the doctrine in *Claassen v. United States*, 142 U.S. 140 (1891). There, a criminal defendant was convicted of five offenses and sentenced to one six-year prison term. *Id.* at 141, 147. The defendant appealed all of his convictions, but the Court addressed only one of them, holding that because the one conviction was "sufficient to support the judgment and sentence, the question of the sufficiency of the other counts need not be considered." *Id.* at 146. "In criminal cases, the general rule, as stated by Lord Mansfield before the Declaration of Independence, is 'that, if there is any one count to support the verdict, it shall stand good, notwithstanding all the rest are bad.'" *Id.* (citations omitted).

For nearly one hundred years following *Claassen*, the Supreme Court utilized the concurrent-sentence doctrine regularly and without hesitation. Thus, in *Lawn v. United States*, the Court employed the then-most recent iteration of the doctrine. Specifically, it observed that the defendant "also contests the sufficiency of the evidence to support the verdicts against him on Counts 7 and 9, but since the sentence upon those counts run concurrently with the sentence on Count 10, which we have found sustained by the evidence, it is unnecessary for us to consider

those contentions." 355 U.S. 339, 359 (1958) (citations omitted). Similarly, in *Hirabayashi v. United States*, the Court wrote: "Since the sentences of three months each imposed by the district court on the two counts were ordered to run concurrently, it will be unnecessary to consider questions raised with respect to the first count if we find that the conviction on the second count, for violation of the curfew order, must be sustained." 320 U.S. 81, 85 (1943) (citations omitted); *see also Roviaro v. United States*, 353 U.S. 53, 59 n.6 (1957); *Pinkerton v. United States*, 328 U.S. 640, 641 n.1 (1946); *United States v. Sheridan*, 329 U.S. 379, 381 (1946); *United States v. Johnson*, 319 U.S. 503, 518 (1943); *United States v. Trenton Potteries Co.*, 273 U.S. 392, 401–02 (1927); *Brooks v. United States*, 267 U.S. 432, 441 (1925). In fact, in some instances the Supreme Court referred to the concurrent-sentence doctrine as a mandatory jurisdictional rule grounded in principles of mootness and non-justiciability. *See, e.g.*, *Barenblatt v. United States*, 360 U.S. 109, 115 (1959).

In *Benton v. Maryland*, 395 U.S. 784, 791 (1969), the Court addressed the issue whether collateral consequences that attached to a challenged conviction were sufficient to give the case "an adversary cast and make it justiciable." Significantly, it acknowledged that it had adopted a very lenient standard for determining justiciability. *See id.* at 790. Indeed, after setting out one example of possible collateral consequences, the Court recognized that "this possibility may well be a remote one," but nonetheless found it to be sufficient. *Id.* at 790–91. Nevertheless, assuming that there was such a controversy, "[i]t may be that in certain circumstances a federal appellate court, as a matter of discretion, might decide (as in *Hirabayashi*) that it is 'unnecessary' to consider all the allegations made by a particular party. The concurrent sentence rule may have some continuing validity as a rule of judicial convenience." *Id.* at 791. Shortly after *Benton,* the Court expressly invoked the concurrent-sentence doctrine as a matter of discretion. *Barnes v. United*

*States*, 412 U.S. 837, 848 n.16 (1973). In so doing, the Court observed that, "[a]lthough affirmance of petitioner's conviction on two of the six counts carrying identical concurrent sentences does not moot the issues he raises pertaining to the remaining counts, *Benton v. Maryland*, 395 U.S. 784 (1969), we decline as a discretionary matter to reach these issues." *Barnes*, 412 U.S. at 848 n.16; *see also United States v. Alessi*, 638 F.2d 466, 476 (2d Cir. 1980) (applying the concurrent-sentence doctrine because "no purpose would be served in reviewing the legality of the duplicative sentences").

Subsequently, in *Rutledge v. United States*, 517 U.S. 292, 301–02 (1996), the Supreme Court repeated language from its earlier holding in *Ball v. United States*, 470 U.S. 856, 864–65 (1985), that a "second conviction, whose concomitant sentence is served concurrently, does not evaporate simply because of the concurrence of the sentence." More specifically, "the presence of two convictions on the record may delay the defendant's eligibility for parole or result in an increased sentence under a recidivist statute for a future offense. Moreover, the second conviction may be used to impeach the defendant's credibility and certainly carries the societal stigma accompanying any criminal conviction." *Rutledge*, 517 U.S. at 302 (citations omitted) (quoting *Ball*, 470 U.S. at 865). Nevertheless, in response to the argument that the defendant "will never be exposed to collateral consequences like those described in *Ball*," the *Rutledge* Court ultimately declined to resolve the matter, and instead fell back on the $50 special assessment as sufficient to defeat the application of the concurrent-sentence doctrine on direct appeal. 517 U.S. at 302. (In *Ray v. United States*, 481 U.S. 736, 737 (1987), the Court had held that a special assessment, which must be imposed on each count of conviction, 18 U.S.C. § 3013, is unique to the challenged conviction and will turn solely on the validity of that conviction—in this sense, the two sentences cannot be truly "concurrent.")

Ultimately, in *Spencer v. Kemna*, 523 U.S. 1 (1998), the Supreme Court began a retreat from "its earlier willingness to presume adverse consequences sufficient to defeat a claim of mootness." 7 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 27.5(a) (4th ed. 2015). There, a defendant was sentenced to a three-year term of imprisonment but then was released on parole with approximately eighteen months remaining in his sentence. *Spencer*, 523 U.S. at 3. His parole was then revoked and he was returned to jail after a hearing at which it was determined that he had used illicit drugs. *See id.* at 3–5. With six months remaining in his sentence, the defendant filed a habeas petition, arguing that the revocation of his parole violated due process. *Id.* at 5. The defendant was ultimately released before his habeas petition was adjudicated, *id.* at 6, and the Court held that the habeas petition was moot because the three-year sentence had been served and because there were no collateral consequences stemming from the parole revocation. *See id.* at 8, 14–16. Among the collateral consequences that the Court rejected were those which it had previously suggested in *Ball* could preclude the application of the concurrent-sentence doctrine. Specifically, the defendant in *Spencer* had argued that his parole revocation could affect him because it could be used: (1) "to his detriment in a future parole proceeding"; (2) "to increase his sentence in a future sentencing proceeding"; (3) "to impeach him should he appear as a witness or litigant in a future criminal or civil proceeding"; and (4) "against him directly . . . should he appear as a defendant in a criminal proceeding." *Id.* at 14–15. While the Court conceded that its prior holdings might require the "presumption" of collateral consequences, this presumption was not conclusive. *See id.* at 8, 13.

The *Spencer* Court explained that, as a general matter, the conception of Article III standing has changed since the days of *Benton v. Maryland*, evolving to require concrete injuries-in-fact rather than speculative collateral consequences. 523 U.S. at 11–14. Accordingly, it rejected all of

the defendant's proposed collateral consequences as speculative "rather than a certainty or even a probability," *id.* at 14, holding that the case was moot and that it failed to satisfy Article III's case-or-controversy requirement. *Id.* at 14–18; *see also Maleng v. Cook*, 490 U.S. 488, 492 (1989). Indeed, more recently, in *Clapper v. Amnesty Int'l USA*, the Supreme Court held that: "To establish Article III standing, an injury must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling. Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending. Thus, we have repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that [a]llegations of *possible* future injury are not sufficient." 133 S. Ct. 1138, 1147 (2013) (internal quotation marks and citations omitted).

While I need not go so far in order to decide the concurrent-sentence aspect of this case, in my view virtually none of the far-fetched hypothetical collateral consequences that have been cited in earlier cases are sufficient to satisfy the standard set out in *Clapper*, and these cases are no longer good law. Indeed, even before *Clapper*, the Supreme Court focused on the issue of whether collateral consequences are adequate to meet Article III's injury-in-fact requirement. *See United States v. Juvenile Male*, 560 U.S. 558, 560 (2010) (per curium). There, the defendant challenged on direct appeal certain conditions of his federal supervised release requiring that he register as a sex offender. *Id.* By the time the case reached the Supreme Court, the underlying term of supervised release had expired, thus raising a question of mootness. *Id.* Nevertheless, there was a potential collateral consequence to the supervised release: the prospect that, due to the operation of state law, the defendant would be permanently subject to sex registry requirements because his now-expired federal supervised release once required sex registration. *Id.* at 561. The Court held

that, "this case likely is moot unless [defendant] can show that a decision invalidating the sex-offender-registration conditions of his . . . supervision would be sufficiently likely to redress '*collateral consequences adequate to meet Article III's injury-in-fact requirement*.'" *Id.* at 560 (emphasis added) (quoting *Spencer v. Kemna*, 523 U.S. 1, 14 (1998)).

Perhaps out of deference to the Supreme Court's marked shift in focus to the application of Article III's injury-in-fact requirement, federal courts still sometimes invoke the concurrent-sentence doctrine on direct appeal, such as when a defendant appeals only his sentence rather than his entire conviction. *See, e.g.*, *United States v. Pardo*, 25 F.3d 1187, 1194 & n.6 (3d Cir. 1994). Indeed, only recently the Second Circuit alluded to "the Supreme Court's continued acceptance, in however limited a form, of the concurrent sentence doctrine, which allows courts, in their discretion, to avoid reaching the merits of a claim altogether in the presence of identical concurrent sentences." *Tavarez v. Larkin*, 814 F.3d 644, 649 (2d Cir.), *cert. denied*, 137 S. Ct. 106 (2016). Similarly, numerous state courts continue applying the doctrine without reservation, and in doing so they often stress the doctrine's "value in preserving scarce judicial resources and in avoiding the unnecessary decision of potentially difficult legal questions." 7 WAYNE R. LAFAVE ET AL., CRIMINAL PROCEDURE § 27.5(b) (4th ed. 2015).

Significantly, the concurrent-sentence doctrine is most applicable within the context of habeas review because a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 attacks only the legality of the petitioner's confinement. Put another way, habeas corpus serves "to examine the legality of the commitment" and to "liberate an individual from unlawful imprisonment." *Ex parte Watkins*, 28 U.S. 193, 202–03 (1830). Thus, as Justice Harlan once observed,

> Habeas corpus ad subjiciendum is today, as it has always been, a
> fundamental safeguard against unlawful custody. The importance

> of this prerogative writ, requiring the body of a person restrained of liberty to be brought before the court so that the lawfulness of the restraint may be determined, was recognized in the Constitution, and the first Judiciary Act gave the federal courts authority to issue the writ 'agreeable to the principles and usages of law.' Although the wording of earlier statutory provisions has been changed, the basic question before the court to which the writ is addressed has always been the same: in the language of the present statute, on the books since 1867, *is the detention complained of 'in violation of the Constitution or laws or treaties of the United States'?*

*Fay v. Noia*, 372 U.S. 391, 449 (1963) (Harlan, J., dissenting) (emphasis added) (quoting 28 U.S.C. § 2241).

Yet, as stated earlier, Dhinsa admits that the success of his current petition will not alter the length or nature of his custody, or affect the legality of his continued detention—he will not be released. Pet'r's Ltr., Feb. 25, 2015, ECF No. 27. Specifically, as I observed earlier, in the event that the obstruction of justice murder convictions (counts 5 and 9) are vacated, Dhinsa will still remain imprisoned serving four other life sentences, including two life sentences imposed for murder in aid of racketeering involving the same victims as those in the obstruction of justice murders. In his briefing, Dhinsa contested the application of the concurrent-sentence doctrine based primarily on the special assessments that were imposed on counts 5 and 9. Pet'r's Mem. Addressing Concurrent Sentence Doctrine at 1–4, ECF. No. 32. At oral argument, however, Dhinsa's counsel conceded that special assessments are a "legal fiction" within the context of collateral consequences, and that Dhinsa has no interest in actually obtaining a refund. *See* Transcript of Oral Argument, July 8, 2015, at 20, ECF No. 36. Instead, Dhinsa relied on *Gonzalez v. United States*, 792 F.3d 232, 237 (2d Cir. 2015), which stands for the proposition not relevant here that onerous restitution orders might be cognizable on habeas review in those limited circumstances where they create a "severe restraint on liberty."

Moreover, Dhinsa's counsel conceded during oral argument that none of the hypothetical collateral consequences set out in *United States v. Vargas*, 615 F.2d 952, 959–60 (2d Cir. 1980), similar to those alluded to earlier, and that preclude application of the concurrent-sentence doctrine, apply on the facts here except possibly societal "stigma" due to serving six life sentences instead of four.  Transcript of Oral Argument, July 8, 2015, at 6–7, 17, ECF No. 36.  Of course, *Vargas* itself questioned the strength of stigma as a collateral consequence under the circumstances of that case.  615 F.2d at 960.  Moreover, under the facts here, it cannot reasonably be argued that vacating two of Dhinsa's six life sentences will remove a societal stigma from which Dhinsa suffers a discernable injury.  This is especially true because Dhinsa does not contest that he murdered Manmohan and Satinderjit.  *See* Pet'r's Mem. Supp. Habeas Pet. at 7–9, ECF. No. 2; Pet'r's Suppl. Mem. Supp. Collateral Relief at 6–8, ECF No. 24.

Indeed, these concurrent sentences provide a more compelling reason for not presuming far-fetched hypothetical collateral consequences that may be sufficient in a case involving a single count of conviction and an expired prison sentence.  Thus, in a recent case involving such a single count of conviction, the Second Circuit indulged a presumption that such collateral consequences were present.  *See Nowakowski v. New York*, 835 F.3d 210, 223–26 (2d Cir. 2016).  In so doing, it alluded to Supreme Court cases declining to apply the doctrine of mootness based on "the possibility that the conviction would be used to impeach testimony [a defendant] might give in a future proceeding and the possibility that it would be used to subject him to persistent felony offender prosecution if he should go to trial on any other felony charges in the future."  *Id.* at 223 (quoting *Spencer v. Kemna*, 523 U.S. 1, 10 (1998)).  The presumption of such consequences was sufficient to save the petition in *Nowakowski* from dismissal on mootness grounds in that case.  *Id.* at 228.  Nevertheless, out of deference to the Supreme Court's observation that the presumption

of collateral consequences "is an anomaly in Article III standing," *id.* at 224 (citing *Spencer*, 523 U.S. at 12), and "[m]indful of the Supreme Court's caution in this area," *id.* at 225, the Second Circuit held that this presumption was not conclusive and could be rebutted by the prosecution's showing that no collateral consequences would result from the single count of conviction. *Id.* The manner in which the Second Circuit so held provides a significant guidepost for resolving the present case. Specifically, it set out the appropriate standard as follows:

> [A] petitioner seeking habeas review must identify some continuing collateral consequences that may flow from his criminal conviction—including those that, as discussed above, are merely hypothetical and speculative. Once a petitioner does so, however, the state bears the burden to prove by sufficient evidence that there is "no possibility" such consequences will attach to his conviction. *See Sibron v. N.Y.*, 392 U.S. 40, 57 (1968).

*Nowakowski*, 835 F.3d at 225.

While this standard is hard to reconcile with the Article III analysis set out in *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013), the burden that *Nowakowski* places on the prosecution is easily met in the present case. Because the four concurrent mandatory life sentences that Dhinsa is serving would not be affected by the relief he seeks here, there can be no enhancement of a future conviction. While Dhinsa argues "who knows what would happen in the future," Transcript of Oral Argument, July 8, 2015, at 3, 17, ECF No. 36, it is nearly impossible to imagine a scenario in which Dhinsa's four other life terms would be vacated such that the present habeas petition could have any practical consequence. Moreover, even if prosecuted for a subsequent offense, his testimony would be subject to comparable impeachment because of his conviction for the murders of Manmohan and Santinderjit on the unchallenged murder counts, in addition to the other offenses of which he was convicted that were also predicated on the very same murders. *See Nowakowski v. New York*, 835 F.3d 210, 225 n.19 (2d Cir. 2016) ("[I]f the

identified collateral consequences arise from separate and independent grounds from that conviction, the conviction 'can have no meaningful effect . . . and hence cannot serve as a possible collateral consequence.'" (quoting *Perez v. Greiner*, 296 F.3d 123, 126 (2d Cir. 2002)).  Indeed, as discussed below, Dhinsa does not even argue that he would suffer those collateral consequences.

While the foregoing analysis should suffice to reject Dhinsa's petition based on the application of the concurrent-sentence doctrine, I add this caveat.  In a line of cases, the most recent of which is *Tavarez v. Larkin*, 814 F.3d 644, 648 (2d Cir.), *cert. denied*, 137 S. Ct. 106 (2016), the Second Circuit has either declined to apply the concurrent-sentence doctrine or reaffirmed its unwillingness to do so based on the far-fetched hypothetical collateral consequences to which I have already alluded.  *See also United States v. Davis*, 689 F.3d 179, 184 (2d Cir. 2012); *Jackson v. Leonardo*, 162 F.3d 81, 86–87 (2d. Cir. 1998).  Not only are the holdings in these cases inconsistent with the more recent Supreme Court cases that I have discussed, they are difficult to reconcile with the analysis employed by the Second Circuit itself in *Nowakowski*.  Nevertheless, because of the extraordinary circumstances in this case, there is reason to question whether the Second Circuit would refuse to do so here.  Indeed, in *Tavarez*, the Second Circuit continued to speak of the "discretionary concurrent sentence doctrine," while at the same time declining the district attorney's invitation to invoke it.  814 F.3d at 648.  Assuming the existence of discretion, it would be an abuse of discretion not to apply the concurrent-sentence doctrine here.

## II.    *Merits of the Petition*

The foregoing considerations aside, I address the merits of Dhinsa's petition because the order of the Second Circuit on remand directed me to consider the issue whether (1) Dhinsa "satisfies the criteria set forth in 28 U.S.C. § 2255(e), and may therefore bring his petition under . . . 28 U.S.C. § 2241, *see Triestman v. United States*, 124 F.3d 361 (2d Cir. 1997); *see also Fowler*

*v. United States*, 563 U.S. 668 (2011) (requiring, for a conviction under 18 U.S.C. § 1512(a)(1)(C), the government to show a 'reasonable likelihood' that the victim would have communicated with federal officials); and, if so, (2) whether the petition can and should be granted under § 2241." Mandate, May 6, 2013, at 1–2, ECF No. 15.

### A. *Fowler*'s Change in Law

In *Triestman v. United States*, 124 F.3d 361, 374–78 (2d Cir. 1997), which was discussed earlier, the Second Circuit interpreted 28 U.S.C. § 2255(e), which has come to be known as an "escape hatch" that allows a petitioner who cannot otherwise obtain relief pursuant to § 2255 to obtain relief pursuant to 28 U.S.C. § 2241. There, the petitioner argued that "if § 2255 forecloses all judicial review in a case in which a federal prisoner claims that, on the record, he is innocent of the crime of which he stands convicted—in circumstances in which that claim could not have been presented earlier, it is unconstitutional to that extent." *Triestman*, 124 F.3d at 378 (internal quotation marks omitted). The Second Circuit agreed that "serious Eighth Amendment and due process questions would arise with respect to the AEDPA if [it] were to conclude that . . . Congress had denied [the petitioner] the right to [obtain] collateral review in this case." *Id.* at 378–79. Consequently, the Second Circuit held that the escape hatch would be available to a prisoner who "cannot, for whatever reason, utilize § 2255, and in which the failure to allow for collateral review would raise serious constitutional questions." *Id.* at 377. "[T]o date, [the Second Circuit has] recognized only one" type of case "raising such serious constitutional questions," namely, "cases involving prisoners who . . . can prove 'actual innocence on the existing record.'" *Cephas v. Nash*, 328 F.3d 98, 104 (2d Cir. 2003) (quoting *Triestman*, 124 F.3d at 363); *see also Rivas v. Fischer,* 687 F.3d 514, 551 (2d Cir. 2012). Or, as the Ninth Circuit has succinctly summarized, citing *Triestman* and several other decisions from the courts of appeals, "a § 2241 petition is available

under the 'escape hatch' of § 2255 when a petitioner (1) makes a claim of actual innocence, and (2) has not had an 'unobstructed procedural shot' at presenting that claim." *Stephens v. Herrera*, 464 F.3d 895, 898 (9th Cir. 2006) (quoting *Ivy v. Pontesso*, 328 F.3d 1057, 1060 (9th Cir. 2003)). Thus, the threshold issue here is whether Dhinsa could have previously presented the argument he now makes based on *Fowler*. He could have, and for that reason his present petition must be denied.

Dhinsa claims that *Fowler* "changed the law" regarding obstruction of justice murder. The underlying statute—referred to as the "federal witness tampering statute"— makes it a crime "to kill another person, with intent to . . . prevent the communication by any person to a law enforcement officer . . . of the United States of information relating to the . . . possible commission of a Federal offense." 18 U.S.C. § 1512(a)(1)(C). In *Fowler v. United States*, 563 U.S. 668, 670 (2011), the Supreme Court "focus[ed] on instances where a defendant killed a person with an intent to prevent that person from communicating with law enforcement officers in general but where the defendant did not have federal law enforcement officers (or any specific individuals) particularly in mind." More specifically, the question presented in that case "concern[ed] what, if anything, the Government must show beyond this broad indefinite intent in order to show that the defendant more particularly intended to prevent communication with *federal* officers as well." *Id.* The Court held that, "in such circumstances, the Government must show that there was a *reasonable likelihood* that a relevant communication would have been made to a federal officer." *Id.* This standard is satisfied where the "likelihood of communication to a federal officer was more than remote, outlandish, or simply hypothetical." *Id.* at 678.

*Fowler* cannot be said to have changed the law, either by overruling one of its own cases or by adopting a rule contrary to the law of the Second Circuit (as was true in *Triestman*, where

the Supreme Court expressly overruled the standard that had been applied in the Second Circuit). *See Triestman*, 124 F.3d 361, 364 (2d Cir. 1997). Instead, the Supreme Court granted Fowler's petition for certiorari to resolve a conflict between, on the one hand, the standard set out by the Fourth Circuit in *United States v. Harris*, 498 F.3d 278, 286 (4th Cir. 2007), and, on the other hand, the standard set out by the Second Circuit in *United States v. Lopez*, 372 F.3d 86, 91–92 (2d Cir. 2004), *vacated on other grounds*, 544 U.S. 902 (2005). *Fowler*, 563 U.S. at 671. Under the Fourth Circuit's standard, the "federal nexus" requirement in § 1512(a)(1)(C) was met "[s]o long as the information the defendant seeks to suppress actually relates to the commission or possible commission of a federal offense." *Harris*, 498 F.3d at 286. In contrast, under the Second Circuit's standard, the federal nexus requirement was met by the prosecutor's showing of a "federal crime along with 'additional appropriate evidence' that 'the victim *plausibly* might have turned to federal officials.'" *Fowler*, 563 U.S. at 671 (quoting *Lopez*, 372 F.3d at 91–92). The Oxford American Dictionary defines "plausible" as "seeming reasonable or probable." *Plausible*, Oxford American Dictionary 761 (1999).

    *Fowler* held that, in order to satisfy the "reasonable likelihood" standard, "[t]he Government need not show that such a communication, had it occurred, would have been federal beyond a reasonable doubt, nor even that it is more likely than not," but only that the chance of such a communication "was more than remote, outlandish, or simply hypothetical." 563 U.S. at 678. The Supreme Court thus rejected the Fourth Circuit's standard, which merely called for the prosecutor to show the "possibility that [the victim's] information would eventually be communicated to federal authorities." *Harris*, 498 F.3d at 286 n.5. "[B]ecause of the frequent overlap between state and federal crimes, the use of a standard based on the word 'possible' would

transform a federally oriented statute into a statute that would deal with crimes, investigations, and witness tampering that, as a practical matter, are purely state in nature." *Fowler*, 563 U.S. at 677.

Dhinsa argues that *Fowler* presents a standard that was not available at the time of his direct appeal. He is wrong. *Fowler* did not change the law of the Second Circuit, except possibly to make it less defendant-friendly. While Dhinsa takes comfort from a recent Second Circuit case that declined to "explore what gap, if any, exists between *Fowler's* 'reasonable likelihood' standard and our previous 'plausibility' formulation," *United States v. Veliz*, 800 F.3d 63, 75 (2d Cir.), c*ert. denied*, 136 S. Ct. 522 (2015), the Second Circuit held that the framework it articulated in *Lopez* for evaluating whether the federal nexus element of § 1512(a)(1)(C) has been established continues to apply after *Fowler*. *See Veliz*, 800 F3d. at 74. Moreover, *United States v. Diaz*, 176 F.3d 52 (2d Cir. 1999), from which *Lopez*, 372 F.3d at 91, expressly quoted, is the case to which *Fowler* should most aptly be compared. *Diaz*—which was available at the time of Dhinsa's direct appeal—held that "[t]he government must prove that at least one of the law-enforcement-officer communications which the defendant sought to prevent would have been with a federal officer." 176 F.3d at 91. In requiring prosecutors to prove that the victim's communications "would have been with a federal officer," *Diaz* arguably demanded more of prosecutors than does *Fowler*, which requires only a "reasonable likelihood."

Dhinsa seems to draw some comfort from the fact that *Diaz*, 176 F.3d at 90, cited to *United States v. Romero*, 54 F.3d 56 (2d Cir. 1995). Pet'r's Reply Mem. Supp. Collateral Relief at 2, ECF No. 30. He argues that *Romero* announced a prosecution-friendly standard similar to the standard rejected by the Supreme Court in *Fowler*. *Id.* Dhinsa thus claims that *Fowler* was a change in law because *Diaz*'s citation to *Romero* rendered *Romero* binding at the time of Dhinsa's appeal. *Id.* This argument is seriously flawed. First, *Romero* is not contrary to *Fowler*. *Romero* held that the

government need not prove that a federal investigation was ongoing at the time of a murder in order to satisfy the "federal nexus" requirement in 18 U.S.C. § 1512(a)(1)(C). *Romero*, 54 F.3d at 62. Yet *Fowler* endorses that very same idea and expressly contemplates a federal nexus even where a federal investigation begins after a murder. *See* 563 U.S. 668, 675–76 (2011). Second, even assuming that some aspects of *Romero* were contrary to *Fowler*, Dhinsa fails in his attempt to portray *Diaz* as adopting *Romero* wholesale. Indeed, *Diaz* merely cited *Romero* for the general proposition that murder victims can be potential (rather than actual) informants and still satisfy the federal nexus requirement. *Diaz*, 176 F.3d at 90. This proposition was true at the time of *Diaz*, and is true today under *Fowler*. *See* 563 U.S. at 675–76.

Significantly, Dhinsa raised at trial the very argument he now presents in his habeas petition. That is, he specifically objected to jury instructions that permitted a finding of guilt based only on the presence of federal crimes rather than a likelihood of communication to a federal officer. *See* Pet'r's Suppl. Mem. Supp. Collateral Relief at 11–13, ECF No. 24. Indeed, Dhinsa's briefing claims that Dhinsa "forecast[ed] *Fowler*'s holding almost a decade in advance [when he argued at trial that] there has to be some kind of reasonable connection between there being the likelihood of a federal crime." *Id.* at 12 (internal quotation marks omitted). Yet Dhinsa did not present this argument on direct appeal or in either of his two previous habeas petitions. Dhinsa actually cited the *Diaz* decision in his briefing to the Second Circuit on direct appeal, albeit for a different proposition not relevant here. Def.'s Reply Br., *United States v. Dhinsa*, No. 99-1682, 2000 WL 33977905, at *12 (2d Cir. July 21, 2000).

The Ninth Circuit confronted a similar issue in *Harrison v. Ollison*, 519 F.3d 952, 959 (9th Cir. 2008), where the petitioner sought to bring a habeas petition pursuant to § 2241 claiming that he did not satisfy the "interstate commerce element" of 18 U.S.C. § 844(i), the statute under which

he was convicted. The petitioner contended that he qualified for § 2255's "escape hatch" because "his claim was not available" until after the Supreme Court addressed the relevant statutory definition in *Jones v. United States*, 529 U.S. 848 (2000), nearly a decade after petitioner's first § 2255 motion. *Harrison*, 519 F.3d at 959. The Ninth Circuit disagreed. *Id.* at 960. It found that, while *Jones* "provided further clarification" of the reasoning set out in *Russell v. United States*, 471 U.S. 858 (1985) (which came down several years before Harrison's direct appeal and construed the interstate commerce element of § 844(i)), as well as "additional encouragement" for petitioner's argument, it "did not materially vary from the statutory construction set forth in *Russell*." *Harrison*, 519 F.3d at 960–61. *Harrison* also noted that the Ninth Circuit had interpreted the interstate commerce element in two decisions issued before the petitioner's direct appeal, "both of which were consistent with *Russell* and *Jones*," and reasoned that those two cases and *Russell* "provided an ample basis" for the petitioner's argument. *Id.* at 960–61. "Accordingly, the case law, as it stood at the time that [the petitioner] pleaded guilty, failed to prosecute his direct appeal, and filed his first motion under § 2255, invited the very argument that [the petitioner] attempts to raise many years later through collateral attack." *Id.* at 961. *Harrison* therefore concluded that *Jones* did not rise to the level of a "*change* in the law creating a previously unavailable legal basis for petitioner's claim." *Id.* (citing *Ivy v. Pontesso*, 328 F.3d 1057, 1060 (9th Cir. 2003)). Dhinsa's "change of law" argument fails for the same reasons.


### B. *Actual Innocence*

Nor can Dhinsa establish that the alleged due process error "has probably resulted in the conviction of one who is actually innocent." *Bousley v. United States*, 523 U.S. 614, 623 (1998)

(quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)); *see also De Jesus v. United States*, 161 F.3d 99, 102 (2d Cir. 1998). Specifically, the evidence here is sufficient to meet the federal nexus standard that *Fowler* enunciated. Indeed, as mentioned earlier, Dhinsa does not contest that he murdered Manmohan and Satinderjit to prevent their communications with law enforcement, but only whether those communications might have been made to federal officers. *See* Pet'r's Mem. Supp. Habeas Pet. at 7–9, ECF. No. 2; Pet'r's Suppl. Mem. Supp. Collateral Relief at 6–8, ECF No. 24. Of course, under *Fowler v. United States*, 563 U.S. 668, 678 (2011), the prosecutor need only show a "reasonable likelihood" that "(in the absence of the killing) at least one of the relevant communications would have been made to a federal officer." This standard is satisfied by showing that "the likelihood of communication to a federal officer was more than remote, outlandish, or simply hypothetical." *Id.*

The evidence at Dhinsa's trial meets *Fowler's* federal nexus standard because: (1) "Dhinsa instructed Dodson to kill Manmohan because [Manmohan] was cooperating with the police in a murder investigation involving [Dhinsa's] brother," *United States v. Dhinsa*, 243 F.3d 635, 660 (2d. Cir. 2001); (2) Dhinsa was involved throughout all pertinent times in federal offenses other than the murders of Manmohan and Santinderjit, including kidnapping, mail fraud, wire fraud, and racketeering, *see id.* at 642–43, 645–46, 662–63, 670; (3) at the time of his murder, Satinderjit was already communicating with local officers, who ultimately shared the entirety of their investigative material with federal officers, *see id.* at 644–45, 647; and (4) a federal trial was eventually commenced against Dhinsa involving numerous crimes in addition to the murders of Manmohan and Santinderjit, both of whom would have been likely witnesses. *See id.* at 642, 657. These facts go well beyond those in *United States v. Ramos-Cruz*, 667 F.3d 487, 497 (4th Cir. 2012), where the Fourth Circuit recently held that *Fowler* is met upon showing a federal crime plus "additional

appropriate evidence" of a federal nexus, such as a short time period between the victim's murder and the inception of a federal investigation. *Id.* at 498. Of course, in the present case, Dhinsa concedes that a federal investigation began as early as July 4, 1997, sixteen days after the murder of Satinderjit in June 1997. Pet'r's Reply Br. at 3, ECF No. 30.[2] Indeed, in July 1997, FBI agent James Glynn obtained the arrest warrant for Dhinsa and a search warrant for one Dhinsa's gas stations, and personally participated in the execution of the warrants. Resp't's Mem. Opp'n Habeas Pet., Gov't App'x at 303–04, ECF No. 25; *see also Dhinsa*, 243 F.3d at 647.

Significantly, there is substantial indication that a federal investigation would have ensued had Manmohan and Santinderjit not been murdered. Particularly relevant here was Dhinsa's involvement in numerous kidnappings, including the kidnapping of Muchtir Ghuman (an investor in a local Indian restaurant) and Kulwant (Manmohan's brother), for whom Manmohan was searching after Kulwant disappeared. *Dhinsa*, 243 F.3d at 644–46. Indeed, 18 U.S.C. § 1201(a)(1) makes it a federal offense to kidnap whenever a victim is transported across state lines, and there is a rebuttable presumption that such interstate transport has occurred when a victim has been

---

[2] Perhaps because the issue was not the subject of serious contention at trial, the record provided by the United States Attorney in response to the petition does not make it possible to determine the exact date when the FBI became involved in the investigation. Nevertheless, additional development of the record could potentially establish that federal involvement may have begun in early June 1997, prior to the murder of Satinderjit, and possibly as early as May 16, 1997. Specifically, after a seizure of weapons from Dhinsa on May 16, 1997, "members of the FBI were able to recover several serial numbers from two Llama handguns." Gov't Brief, 2000 WL 33977312 at *26, *Dhinsa v. United States*, 243 F.3d 635 (2d Cir. 2001) (No. 99-1682). Moreover, a story in the New York Times published on July 10, 1997, indicated that "early last month [June 1997], several detectives from the 75th Precinct in the East New York section of Brooklyn approached the United States Attorney's office." *Police Say Man Stopped at Nothing for Gasoline Empire*, N.Y. TIMES, (July 10, 1997), http://www.nytimes.com/1997/07/10/nyregion/police-say-man-stopped-at-nothing-for-gasoline-empire.html. Lesley Caldwell, who headed the violent crimes enterprise unit of the United States Attorney's office, is quoted as saying that those detectives "had pieced together some robbery-gone-bad cases that were connected, and some unsolved homicides of Indians at gas stations" that were "all traceable back to this guy Dhinsa." *Id.* As a result, "[a] Dhinsa task force was created" and "[f]ederal investigators pored over allegations from informers that City Gas used rigged gas pumps and was cheating on its taxes, while police detectives focused on the killings." *Id.* The article then goes on to suggest that "[a]mong those helping in the investigation was" Satinderjit. *Id.*

abducted or otherwise seized for twenty-four hours or more. *Id.* at § 1201(b). This was true of both Muchtir and Kulwant. *Dhinsa*, 243 F.3d at 644–46.

Moreover, the FBI regularly engages in kidnapping investigations. Indeed, the FBI's webpage containing a list of "frequently asked questions" repeatedly highlights the role it plays in investigating kidnappings. The webpage states that the FBI "absolutely" works with state and local law enforcement on kidnapping matters, and that it will "initiate" a kidnapping investigation involving sensitive victims such as children even where "there is no known interstate aspect." *See Frequently Asked Questions*, FED. BUREAU OF INVESTIGATIONS (last visited Mar. 1, 2017), *available at* https://www.fbi.gov/about-us/faqs [https://perma.cc/XEP9-KK32]. And even where the victim is not particularly vulnerable due to his or her status or age, the FBI will "monitor" kidnapping situations even when "there is no evidence of interstate travel, and [offer its] assistance from various entities including the FBI Laboratory." *Id.* Considering the FBI's commitment to investigating kidnapping, one of the offenses of which Dhinsa was convicted, there is, if nothing else, a "reasonable likelihood" that it would have investigated Dhinsa and had relevant communications with Manmohan or Satinderjit, especially considering the existence of Dhinsa's wide spread pump-rigging scheme, which implicated federal mail and wire fraud statutes. *Dhinsa*, 243 F.3d at 662–63. Surely, it cannot be said that such a conclusion is "outlandish" given that the FBI did in fact involve itself in the investigation that resulted in the prosecution of Dhinsa for kidnapping and mail fraud. *Id.* at 647.

## CONCLUSION

I answer both of the questions in the Second Circuit's mandate in the negative. I grant a certificate of appealability with respect to my answer to both of those questions.

**SO ORDERED.**

Brooklyn, New York
March 2, 2017

*Edward R. Korman*
Edward R. Korman
United States District Judge